No. 25-30322

# In the United States Court of Appeals for the Fifth Circuit

VOICE OF THE EXPERIENCED, A MEMBERSHIP ORGANIZATION ON BEHALF OF
ITSELF AND ITS MEMBERS; MYRON SMITH, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED; DAMARIS JACKSON, INDIVIDUALLY AND
ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; NATE WALKER,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED;
DARRIUS WILLIAMS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED; KEVIAS HICKS; JOSEPH GUILLORY; KENDRICK
STEVENSON; ALVIN WILLIAMS,
*Plaintiffs-Appellees*

v.

JAMES M. LEBLANC, SECRETARY, DEPARTMENT OF PUBLIC SAFETY AND
CORRECTIONS; TIM HOOPER, WARDEN, LOUISIANA STATE PENITENTIARY;
MISTY STAGG, IN HER OFFICIAL CAPACITY AS DIRECTOR OF PRISON
ENTERPRISES, INCORPORATED; LOUISIANA DEPARTMENT OF PUBLIC SAFETY
AND CORRECTIONS; PRISON ENTERPRISES, INCORPORATED,
*Defendants-Appellants*

———————————————

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 23-cv-1304, Hon. Brian A. Jackson

———————————————

## MOTION TO EXPEDITE APPEAL

———————————————

*(Counsel listed on inside cover)*

ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants—as "governmental" parties—need not furnish a certificate of interested persons.

/s/ J. Benjamin Aguiñaga
J. BENJAMIN AGUIÑAGA

Under Federal Rule of Appellate Procedure 27 and this Court's Rule 27.5, Appellants (the State) respectfully move the Court to expedite this appeal. The State intends to file its opening brief on or before June 4, 2025. Accordingly, the State respectfully requests that this Court enter the following briefing schedule:

- June 4: State's opening brief due

- June 18: Plaintiffs' response brief due

- June 25: State's reply brief due

This schedule will permit the Court to hear oral argument during its July sitting or any special sitting ordered soon thereafter.[1]

**1.** The need for expeditious review in this appeal arises from a unique feature of the Prison Litigation Reform Act (PLRA) that has caused mootness problems in at least three separate cases before this Court—including a pending appeal in this very litigation. Specifically, the PLRA provides that, in prison-condition cases governed by the PLRA, "[p]reliminary injunctive relief shall automatically expire on the date

---

[1] At the State's request, Plaintiffs described their position as follows: "As the district court's May 23, 2025, Order granted a Temporary Restraining Order, Plaintiffs [sic] position is that it is not an appealable order, and as such, Plaintiffs do not consent to the requested relief." Plaintiffs are wrong, as this Court has already held on materially identical facts in this litigation. *See infra* n.2. And in any event, Plaintiffs are free to brief any jurisdictional argument in their June 18 response brief.

that is 90 days after its entry," unless certain conditions are met. 28 U.S.C. § 3626(a)(2).

The mootness problem that has arisen—in this litigation, *see Voice of the Experienced et al. v. Westcott*, No. 24-30420 (5th Cir.) (*VOTE I*), as well as in *Smith v. Edwards*, 88 F.4th 1119 (5th Cir. 2023), and *Yates v. Collier*, 677 F. App'x 915 (5th Cir. 2017) (per curiam)—is that the preliminary injunction challenged on appeal has automatically expired during the appeal pursuant to the 90-day rule. In *Smith* and *Yates*, the Court held that this automatic termination mooted the appeals, and the Court vacated the underlying preliminary-injunction orders. In *VOTE I*, the parties here likewise agree that the district court's 2024 preliminary injunction automatically expired on appeal, and the panel in that case (Oldham, Douglas, Dennis) is assessing whether to vacate the underlying injunction order as the Court did in *Smith* and *Yates*. The panel heard oral argument on April 30, 2025.

In reaching its mootness determination in *Smith*, this Court declined to apply the capable-of-repetition-yet-evading-review exception on the theory that effective appellate review of a PLRA-governed injunction is possible: "Had the parties raised the PLRA mootness issue

2

in September when Defendants filed their notice of appeal—or at least some time before Plaintiffs first raised it in their November 27 brief—this court could have set a more expedited briefing schedule and perhaps adjudicated the appeal before the preliminary injunction expired." *Smith*, 88 F.4th at 1126. In the same vein, and in trying to avoid vacatur, Plaintiffs have criticized the State in *VOTE I* for not "initiat[ing] briefing far earlier and le[aving] sufficient time for this Court to rule on substantive grounds." Appellees' Br. 20, *VOTE I*; *contra Yates*, 677 F. App'x at 918 (vacating underlying preliminary-injunction order because "the prisoners could have" tried to keep their injunction alive but "[t]hey chose not to do so"); *accord Smith*, 88 F.4th at 1127.

**2.** A similar mootness problem is set to play out in this appeal barring the Court's adoption of an expedited briefing and argument schedule. On Friday, May 23, the district court entered another "temporary restraining order"—a mandatory injunction directing Louisiana corrections officials to take certain measures related to heat conditions at the Louisiana State Penitentiary.[2] *See* Ex. A. Under the

---

[2] As in *VOTE I*, the Court has appellate jurisdiction over this "temporary restraining order" under 28 U.S.C. § 1292(a)(1). Both in *VOTE I* and here, the district court entered alleged "temporary restraining order[s]." Unpublished Order 3, *VOTE I*, ECF 41-1; *see* App.38. While this Court ordinarily "lack[s] jurisdiction to review a

PLRA's 90-day rule, therefore, the injunction will expire on August 21, 2025, unless Plaintiffs and the district court satisfy the PLRA's prerequisites for avoiding automatic termination. Briefing on a normal 30-30-21 schedule (plus oral argument), however, would not be complete until after August 21, presenting the same mootness problem this Court has seen in *Smith*, *Yates*, and *VOTE I*. Accordingly, as the Court suggested in *Smith*, only "a more expedited briefing schedule" could permit adjudication of this appeal before August 21. 88 F.4th at 1126.

For this reason, the State respectfully requests that this Court expedite this appeal and enter the following briefing schedule:

- June 4: State's opening brief due

- June 18: Plaintiffs' response brief due

- June 25: State's reply brief due

Under this schedule, the Court may hear argument during the July sitting or any special sitting ordered soon thereafter.

---

TRO,'" "'the label attached to an order is not dispositive.'" Unpublished Order 3, *VOTE I*, ECF 41-1. Instead, "where an order has the practical effect of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction." *Id.* (cleaned up). That is the case here, just as it was in *VOTE I*: "In this case, the district court's order has the practical effect of an injunction. It includes no expiration date, instead providing indefinite relief. In addition, the district court held a hearing at which the State strongly contested the need for injunctive relief." *Id.* Accordingly, this Court "ha[s] jurisdiction." *Id.*

Respectfully submitted,

Dated:   May 28, 2025

ELIZABETH B. MURRILL
Attorney General of Louisiana

*J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

## CERTIFICATE OF SERVICE

I certify that on May 28, 2025, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

## CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this motion complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2) because it contains 916 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

Dated:   May 28, 2025

EXHIBIT A

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

VOICE OF THE EXPERIENCED, A                          CIVIL ACTION
MEMBERSHIP ORGANIZATION ON
BEHALF OF ITSELF AND ITS
MEMBERS, ET AL.

VERSUS

JAMES LEBLANC, ET AL.                          NO. 23-01304-BAJ-EWD

## RULING AND ORDER

Before the Court is Plaintiffs' **Application For A Second Temporary Restraining Order ("TRO") (Doc. 201)**, which requests that the Court issue a TRO immediately requiring Defendants to issue a "Heat Alert" whenever the heat index meets or exceeds 88 degrees Fahrenheit and to monitor the heat index every 30 minutes. (Doc. 201-1 at 7). Defendants oppose the Motion. (Doc. 223). Plaintiffs filed a Reply Brief. (Doc. 224). The matter came before the Court for a hearing. (Doc. 233).

For the reasons below, Plaintiffs' Application for a Second TRO will be **GRANTED**. (Doc. 201). Plaintiffs' Motion for a Preliminary Injunction will be addressed separately.

### I. FACTUAL BACKGROUND

In this case, Plaintiffs challenge the Farm Line at Louisiana State Penitentiary in Tunica, Louisiana, otherwise known as "Angola" or "LSP," as

1

unconstitutional.[1] At LSP, incarcerated persons are sometimes required to perform agricultural labor for a variety of prison programs.

The usefulness and sophistication of the labor involved in the various programs allegedly differs substantially, with some programs resembling modern-day farming operations and others, such as the Farm Line, serving an almost purely penological function. At this time, Plaintiffs have described the Farm Line as those compulsory, punitive agricultural or farming labor programs operated at Angola, including but not limited to Lines 15a, 15b, 24, and 25. (Doc. 37-1 at p. 8 n. 2; Doc. 223 at 6).

Plaintiffs, incarcerated persons at LSP[2] and the Voice of the Experienced, a non-profit organization dedicated to "restoring [] human and civil rights" in the criminal justice system,[3] contend that incarcerated persons forced to work on the Farm Line are subject to an increased risk of physical and psychological harm due to their work on the Farm Line. Plaintiffs allege that incarcerated persons working on the Farm Line are subject to a risk of increased physical harm due to their extensive and continued exposure to high temperatures and heat indexes on the Farm Line. (Doc. 21 at ¶ 61). Plaintiffs also allege that incarcerated persons working on the Farm Line are subject to increased psychological harm due to the Farm Line's similarity to

---

[1] Additional facts have been detailed at length in the Court's prior Rulings. (*See, e.g.*, Doc. 70).

[2] The Court describes the named Plaintiffs at length in Doc. 70, Section II.

[3] *See Voice of the Experienced*, https://www.voiceoftheexperienced.org/ (last visited May 16, 2025).

2

chattel slavery and the manner in which Defendants manage the Farm Line. (*Id.* at p. 1; ¶¶ 51–58).

Named Defendants in this lawsuit are James Leblanc,[4] in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections; Timothy Hooper, in his official capacity as Warden of Louisiana State Penitentiary; Misty Stagg, in her official capacity as Director of Prison Enterprises, Inc.; the Louisiana Department Of Public Safety & Corrections ("DOC"); and Prison Enterprises, Inc. (Doc. 21). Relevant to the instant request, Defendants recently revised the following policies.

### A. HCP8, Dated October 18, 2024.

On October 18, 2024, Defendants revised Health Care Policy No. HCP8 (the "2024 HCP8"). (Doc. 201-10). The 2024 HCP8 applies to all of DOC. (*Id.* at p. 1). The stated purpose of the 2024 HCP8 is to "establish provisions for the reduction of heat pathology and to reduce the exposure to inmates identified as more vulnerable to heat." (*Id.* at ¶ 3).

Relevant here, the 2024 HCP8 defines "Heat Alert" as a "designation when the apparent temperature (heat index) outdoors has exceeded ***91 degrees*** Fahrenheit, requiring special provisions." (*Id.* at ¶ 6(D) (emphasis added)). When the "apparent temperature (heat index) outdoors has exceeded 91 degrees Fahrenheit," DOC "shall announce" a Heat Alert. (*Id.* at ¶ 3(a)(iii)).

---

[4] Since the initiation of this case, Leblanc has resigned as Secretary of DOC.

3

App.3

The previous version of HCP8 in the record, dated August 21, 2018 (the "2018 HCP8"), defined "Heat Alert" as a "designation when the apparent temperature (heat index) outdoors has exceeded **88 degrees** Fahrenheit, requiring special provisions. (Doc. 37-39 at ¶ 6(D) (emphasis added)). Thus, on October 18, 2024, Defendants increased the threshold for the issuance of a Heat Alert from 88 to 91 degrees Fahrenheit. (*Compare* Doc. 37-39 *with* Doc. 201-10).

The 2024 HCP8 dictates that when a Heat Alert is announced, DOC shall provide the following measures to those working outdoors: (1) water and ice at least every 30 minutes; (2) a rest break of at least 15 minutes every 45 minutes; and (3) work hours may be adjusted to accommodate extreme temperatures. (Doc. 201-10 at ¶ 3(a)(iv)). The 2024 HCP8 also directs DOC to monitor the outside temperature every two hours. (*Id.* at ¶ 3(a)(ii)).

**B. Directive No. 13.067, Dated April 8, 2025.**

On April 8, 2025, LSP issued a revised Directive No. 13.067 (the "2025 Directive No. 13.067"). (Doc. 223-2). The 2025 Directive No. 13.067 is a policy specific to LSP. (*Id.* at 1). Like the 2024 HCP8, the purpose of the 2025 Directive No. 13.067 is to "establish provisions for the reduction of heat pathology and to reduce the exposure to inmates identified as more vulnerable to heat." (*Id.*).

The 2025 Directive No. 13.067 defines "Heat Alert" as a "designation when the apparent temperature (heat index) outdoors has exceeded **91 degrees** Fahrenheit, requiring special provisions." (*Id.* (emphasis added)). Similar to HCP8, the previous version of Directive No. 13.067, effective March 21, 2019 (the

4

"2019 Directive No. 13.067"), defined a "Heat Alert" as a "designation when the apparent temperature (heat index) outdoors has exceeded ***88 degrees*** Fahrenheit, requiring special provisions." (Doc. 201-11 at 2 (emphasis added)). Thus, Defendants increased the threshold for the issuance of a Heat Alert from 88 to 91 degrees Fahrenheit in the 2025 Directive No. 13.067.

The 2025 Directive No. 13.067 dictates that when a Heat Alert is announced, the following measures will be provided to incarcerated persons working outdoors: (1) water and ice at least every 30 minutes; (2) a rest break of at least 15 minutes every 45 minutes; and (3) work hours may be adjusted to accommodate extreme temperatures. (Doc. 223-2 at ¶ 3(C)(4)). The 2025 Directive No. 13.067 also requires Field staff to document the Heat Alert on the daily line count sheets and ensure that all rest breaks are clearly documented on the daily line count sheet. (*Id.* at ¶ 3(C)(3)). The 2025 Directive No. 13.067 further directs LSP to monitor and record outside temperatures every hour. (*Id.* at ¶ 3(C)(2)).

## II. PROCEDURAL HISTORY

On September 16, 2023, Plaintiffs filed this lawsuit. (Doc. 1). On December 15, 2023, Plaintiffs filed an Amended Complaint, which serves as the operative Complaint in this matter. (Doc. 21).

Defendants then moved to dismiss Plaintiffs' Thirteenth Amendment claims. (Doc. 22). The Court granted Defendants' Motion for Partial Dismissal and dismissed those claims. (Doc. 56). Plaintiffs' other claims remain.

On May 13, 2024, Plaintiffs moved for a preliminary injunction and temporary restraining order, requesting that the Court immediately enjoin all agricultural labor performed by incarcerated persons on the Farm Line at LSP when heat index values exceeded 88 degrees Fahrenheit. (Doc. 37). The matter came before the Court for a hearing. (Doc. 62).

On July 2, 2024, the Court entered an Order granting Plaintiffs' Motion for a Preliminary Injunction and Temporary Restraining Order in part and denying it in part. (Doc. 70, the "July 2 Order"). The Court did not enjoin labor on the Farm Line at that time but ordered Defendants to alter Farm Line working conditions to protect human health and safety. (*Id.*). Specifically, the Court ordered Defendants to immediately:

1. Correct the deficiencies of Directive No. 13.067 described in the Court's Order, including the lack of shade and adequate rest provided to incarcerated persons laboring on the Farm Line ("Part (1)" of the Court's July 2 Order);

2. Correct the problems with Defendants' equipment policies, including the failure to provide sunscreen and other necessary protective clothing and equipment to those laboring on the Farm Line ("Part (2)" of the Court's July 2 Order);

3. Submit a revised and expanded Heat Pathology Medications list ("Part (3)" of the Court's July 2 Order);

6

4. Create a procedure to ensure that all incarcerated persons suffering from health conditions that significantly inhibit thermoregulation are assessed by medical personnel and are granted heat precaution duty status ("Part (4)" of the Court's July 2 Order); and

5. Develop an additional heat-related policy to protect those laboring outdoors when heat index values reach or exceed 113 degrees Fahrenheit, the temperature at which the National Weather Service issues excessive heat warnings ("Part (5)" of the Court's July 2 Order).

(*Id.*).

That same day, Defendants appealed the Court's July 2 Order to the U.S. Court of Appeals for the Fifth Circuit. (Doc. 71). Defendants moved the Circuit to stay the Court's July 2 Order pending the outcome of the appeal. (Fifth Circuit Case No. 24-30420, Doc. 12). On July 5, 2024, the Circuit entered a temporary administrative stay until July 19, 2024. (Fifth Circuit Case No. 24-30420, Doc. 26).

After additional briefing, the Circuit considered Defendants' motion for stay pending appeal. (Fifth Circuit Case No. 24-30420, Doc. 41). The Circuit vacated the administrative stay and granted in part and denied in part Defendants' motion for stay pending appeal. (*Id.*). Specifically, the Circuit granted a stay pending appeal with respect to parts (3), (4), and (5) of the Court's July 2 Order. (*Id.* at 10). The Circuit denied a stay pending appeal with respect to parts (1) and (2) of the Court's July 2 Order. (*Id.*).

The Circuit reasoned that three portions of the Court's July 2 Order—Parts (3), (4), and (5)—were overbroad because they appeared to reach beyond LSP to cover the entire DOC, rather than inmates working on LSP's Farm Line. (*Id.* at 5). Plaintiffs' proposed classes consist of LSP inmates who could be forced to perform agricultural labor, rather than all Louisiana inmates. (*Id.*). The Circuit found that parts (1) and (2) of the Court's July 2 Order, however, were targeted specifically at the Farm Line, and thus were not overbroad. (*Id.*). Accordingly, the Circuit did not stay parts (1) and (2) of the Court's July 2 Order pending appeal.[5] (*Id.* at 10).

Both parties agree that the Court's July 2 Order has expired under the PLRA. (Doc. 201-1 at 9; Doc. 223 at 5). Nevertheless, the Fifth Circuit heard oral argument in this matter on April 30, 2025. A decision has not yet been issued.

## III.  LEGAL STANDARD

### A. Temporary Restraining Order

Federal Rule of Civil Procedure ("Rule") 65(b) sets forth the requirements that must be met before the Court may issue a TRO. It provides:

> **(1) *Issuing Without Notice.*** The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
> (A) specific facts in an affidavit or a verified complaint clearly show that

---

[5] Defendants also argued in their briefing before the Circuit that the Court's July 2 Order erred because the Court cannot issue classwide relief before certifying the class. (Fifth Circuit Case No. 24-30420, Doc. 41-1 at 6). Recognizing that "[c]lass-wide relief may be appropriate in an individual action if such is necessary to give the prevailing party the relief to which he or she is entitled[,]" the Circuit found that Defendants had not shown a likelihood of success on this issue. (*Id.* (citing *Hernandez v. Reno*, 91 F.3d 776, 781 (5th Cir. 1996)). Thus, the Circuit found that the Court did not err in granting classwide relief on a preliminary basis for parts (1) and (2) of its July 2 Order. (*Id.*).

immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

*(2) Contents; Expiration.* Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record.

Fed. R. Civ. P. 65(b)(1)–(2). Additionally, the party requesting the TRO must provide "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

A TRO is simply a highly accelerated and temporary form of preliminary injunctive relief, requiring that the movant establish the same four elements for obtaining a preliminary injunction: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *See Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). In applying the four-factor analysis, a court must consider the factors on a "sliding scale"—a greater threat of irreparable injury may justify issuance of preliminary relief in a situation with a less certain likelihood of success, and vice versa. *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 635 (M.D. La. 2015).

9

To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988). Irreparable injury is harm that "cannot be undone through monetary damages"—that is, harm for which money damages are inadequate or for which money damages are "especially difficult" to compute. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Allied Marketing Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989).

## B. Eighth Amendment

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. AMEND. VIII. To establish an Eighth Amendment violation for conditions of confinement, "an inmate must show that the alleged violation was sufficiently serious, i.e., that it deprived him of the most minimal level of life's necessities, and that prison officials acted with deliberate indifference to his health or safety." *Hewitt v. Henderson*, 271 F. App'x 426, 428 (5th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 847 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991)). In other words:

> A prison official has violated the Eighth Amendment when he 1) shows a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate. *Farmer*, 511 U.S. at 833–34. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude

10

that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Id.* at 842.

*Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004). Further, "[c]onditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Id.* (citing *Wilson*, 501 U.S. at 304). "The standard against which a court measures prison conditions are 'the evolving standards of decency that mark the progress of a maturing society' and not the standards in effect during the time of the drafting of the Eighth Amendment." *Gates*, 376 F.3d at 333 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

"[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Whitley v. Albers,* 475 U.S. 312, 319 (1986) (some internal quotation marks omitted). The U.S. Supreme Court has held that "[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981). "In making this determination in the context of prison conditions, [the Court] must ascertain whether the officials involved acted with "deliberate indifference" to the inmates' health or safety." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (quoting *Hudson v. McMillian,* 503 U.S. 1, 8 (1992)). Courts "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Id.* (citing *Farmer*, 511 U.S. at 842).

11

App.11

Subjecting incarcerated persons to high heat conditions for sustained periods of time, with inadequate procedures to mitigate the risks inherent in such high heat, is a violation of the Eighth Amendment when prison officials are "deliberately indifferent" to such risks. *See, e.g., Hinojosa v. Livingston*, 807 F.3d 657, 670 (5th Cir. 2015) ("[I]nmates have a right, under the Eighth Amendment, not to be subjected to extreme temperatures without adequate remedial measures"); *Ball*, 792 F.3d at 596 ("[W]e affirm the district court's conclusion that housing these prisoners in very hot cells without sufficient access to heat-relief measures, while knowing that each suffers from conditions that render him extremely vulnerable to serious heat-related injury, violates the Eighth Amendment"); *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *39 (S.D. Tex. July 19, 2017) (finding that, due to continued occurrence of high heat and the inadequacy of efforts to mitigate such heat, "[t]he conditions of confinement at the Pack Unit," a prison operated by the Texas Department of Criminal Justice, "violate the Eighth Amendment").[6]

Further, "prison work requirements which compel inmates to perform physical labor, which is beyond their strength, endangers their lives, or causes undue pain

---

[6] *See also Hope*, 536 U.S. at 738 (Eighth Amendment violation was "obvious" in part because plaintiff was subjected to "unnecessary exposure to the heat of the sun"); *Gates*, 376 F.3d at 340 (holding that the probability of heat-related illness based on the conditions of confinement in a certain cellblock and the open and obvious nature of the risk thereof amounted to an Eighth Amendment violation); *Valigura v. Mendoza*, 265 F. App'x 232, 235 (5th Cir. 2008) ("We have held that temperatures [within confinement] consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment"); *McCollum v. Livingston*, No. 4:14-CV-3253, 2017 WL 608665, at *18 (S.D. Tex. Feb. 3, 2017) (noting that Fifth Circuit precedent provides "that, in the face of extreme heat, prison officials must fashion adequate mitigating measures").

12

constitutes cruel and unusual punishment." *Howard v. King*, 707 F.2d 215, 219 (5th Cir. 1983); *see also Mendoza v. Lynaugh*, 989 F.2d 191, 194 (5th Cir. 1993) ("To be sure, if prison officials assign an inmate to a work detail and they know that such an assignment could exacerbate a serious physical ailment, then such a decision could constitute deliberate indifference."); *Calhoun v. Hargrove*, 312 F.3d 730, 734–35 (5th Cir. 2002) (finding claim sufficient to survive a motion to dismiss where prison official purportedly knew about a four-hour medical work restriction but forced inmate to work long hours, which raised blood pressure to dangerously high levels).

The adequacy of procedures is a fact-specific question that courts have routinely turned to experts for help answering. *See, e.g.*, *Gates*, 376 F.3d at 339 (upholding the issuance of injunctive relief that relied on Dr. Vassallo's testimony that the conditions of confinement were such that it was "very likely" that incarcerated persons in the relevant facility would die from heat stroke or some other heat-related condition); *Ball*, 792 F.3d at 593 (affirming the district court finding that, based mainly on Dr. Vassallo's testimony, the heat conditions and procedures in place within the relevant prison put incarcerated persons at substantial risk of serious harm); *Cole*, 2017 WL 3049540, at *30 (relying on Dr. Vassallo's testimony to find that a particular heat-related prison policy was ineffective).

Courts will issue preliminary or emergency injunctive relief to command that prisons modify their conditions of confinement so as to preserve human life. *See, e.g., Cole*, 2017 WL 3049540, at *46; *Tiede v. Collier*, No. 1:23-CV-1004-RP, 2023 WL 6345966, at *1 (W.D. Tex. Sept. 28, 2023). That being said, in doing so courts

13

remain "barred from enjoining the state to follow its own laws and procedures." *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020).

## IV. DISCUSSION

Plaintiffs ask the Court to enter a TRO immediately requiring Defendants to issue a "Heat Alert" whenever the heat index meets or exceeds 88 degrees Fahrenheit and to monitor the heat index every 30 minutes. (Doc. 201-1 at 7). Defendants respond that the issuance of a TRO is procedurally improper, and if not, Plaintiffs cannot show deliberate indifference with respect to the current Heat Alert threshold of 91 degrees Fahrenheit. (Doc. 223 at 2).

For the reasons below, the Court will **GRANT** Plaintiffs' Motion for a TRO and require Defendants to issue a Heat Alert on the Farm Line at LSP whenever the heat index meets or exceeds 88 degrees Fahrenheit. The Court will further require Defendants to monitor the heat index every 30 minutes on the Farm Line at LSP. For the avoidance of doubt, this relief applies only to the Farm Line at LSP.

### A. The Court Has Jurisdiction to Address Plaintiffs' Request for a Temporary Restraining Order.

Because the Court's July 2 Order is currently on appeal before the Fifth Circuit, the Court must at the outset determine whether it has jurisdiction to grant Plaintiffs' request for a TRO. (*See* Doc. 70; Doc. 71). Both parties agree that the Court's July 2 Order expired by operation of law during the pendency of the appeal. (Doc. 201-1 at 9; Doc. 223 at 5). Nevertheless, the Circuit heard oral argument on the matter and the Circuit has not yet issued a Ruling.

Defendants contend that because the injunction Plaintiffs now seek "nearly mirrors" the injunction on appeal before the Circuit, the Circuit's forthcoming decision may address the merits of the Court's July 2 Order and affect Plaintiffs' current request for a TRO. (Doc. 223 at 5). Plaintiffs disagree, arguing that their application for a TRO seeks entirely new relief. (Doc. 231 at 8). The Court agrees with Plaintiffs.

"A notice of appeal from an interlocutory order does not produce a complete divestiture of the district court's jurisdiction over the case; rather, it only divests the district court of jurisdiction over those aspects of the case on appeal." *Alice L. v. Dusek*, 492 F.3d 563, 564 (5th Cir. 2007). Fifth Circuit caselaw makes this point clear: "It is the general rule that a district court is divested of jurisdiction upon the filing of the notice of appeal with respect to any matters involved in the appeal. However, where an appeal is allowed from an interlocutory order, the district court may still proceed with matters not involved in the appeal." *Id.* at 564–65 (citing *Taylor v. Sterrett,* 640 F.2d 663, 667–68 (5th Cir. 1981); *see also Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control *over those aspects of the case involved in the appeal.*") (emphasis added)); *see also See Satanic Temple, Inc. v. Tex. Health & Hum. Serv. Comm'n,* 79 F.4th 512, 514 (5th Cir. 2023) (determining that "[a]n appeal from a grant or denial of a preliminary injunction does not inherently divest the district court of jurisdiction or otherwise restrain it from taking other steps in the litigation.").

15

The Court issued a TRO in this case on July 2, 2024, ordering Defendants to alter Farm Line working conditions to preserve human health and safety. (Doc. 70). The Court's July 2 Order addressed shade, rest breaks, equipment, sunscreen, protective clothing, the Heat Pathology Medications List, and heat precaution duty status. (*Id.*). The Court's July 2 Order did not address the issues present here: frequency of heat index monitoring and the 91-degree Fahrenheit Heat Alert threshold. (*Id.*). Indeed, because Defendants revised their policies to *raise* the Heat Alert threshold *after* the issuance of the Court's July 2 Order, the 91 degree Fahrenheit Heat Alert policy threshold cannot plausibly be considered to be currently before the Circuit for review. (*Id.*).

Incredibly, although the Court found that Defendants' proposed remedies to address the threat to human health and safety on the Farm Line "border[ed] on bad faith," Defendants nonetheless chose to *raise* the Heat Alert threshold in effect as of the Court's July 2 Order. (*See* Doc. 109 at 2). Approximately three months after the issuance of the Court's July 2 Order, Defendants revised HCP8 to raise the Heat Alert threshold from 88 to 91 degrees Fahrenheit. (Doc. 201-10). Approximately nine months after the Court's July 2 Order, Defendants revised Directive No. 13.067 similarly raising the Heat Alert threshold from 88 to 91 degrees Fahrenheit. (Doc. 223-2 at 1).

Because the issue currently before this Court addresses the *current* Heat Alert threshold, which Defendants implemented after the July 2 Order, and the frequency of heat index monitoring (neither of which were considered in the July 2 Order), the

16

Court cannot conclude that the relief sought here is identical to the relief Plaintiffs previously sought. For the same reasons, the requested relief *sub judice* cannot be considered an "extension" of the Court's July 2 Order. Because an appeal only divests the Court of jurisdiction over those aspects of the case on appeal, and because the aspects of the case currently at issue are *not* on appeal, the Court has jurisdiction to grant Plaintiffs' request for a TRO.

### B. The PLRA Does Not Preclude the Court from Granting Plaintiffs' Request for a Temporary Restraining Order.

Next, citing no jurisprudential support, Defendants contend that the PLRA does not permit multiple injunctions in the same litigation. (Doc. 223 at 13). Plaintiffs respond that Defendants' argument flies in the face of established precedent, as federal courts nationwide have issued successive orders for either preliminary or permanent injunctive relief in similar cases. (Doc. 231 at 7–8 (citing *See, e.g.*, *Monroe* v. *Bowman*, 122 F.4th 688, 697 (7th Cir. 2024) (holding that, under the PLRA, plaintiffs "may ask the district court for a new injunction, preliminary or permanent"); *Melendez* v. *Sec'y, Fla. Dep't of Corr.*, 2022 WL 1124753, at *20–21 (11th Cir. Apr. 15, 2022) (affirming a second preliminary injunction after the first expired by operation of the PLRA); *Mayweathers* v. *Newland*, 258 F.3d 930, 936 (9th Cir. 2001) ("Nothing in the [PLRA] limits the number of times a court may enter preliminary relief.")).

In *Gates v. Cook*, 376 F.3d 323, 344 (5th Cir. 2004), a case governed by the PLRA, the Fifth Circuit affirmed the district court's issuance of three injunctions. *See*

17

*Gates*, 376 F.3d at 344 (affirming three injunctions; vacating seven injunctions on the merits). The U.S. Court of Appeals for the Ninth Circuit Court has held that the PLRA does not bar successive preliminary injunctions:

> Nothing in the [PLRA] limits the number of times a court may enter preliminary relief. If anything, the provision simply imposes a burden on plaintiffs to continue to prove that preliminary relief is warranted.

*Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001). Defendants' twisted reasoning that the words "a" and "an" in the statute prevent the Court from issuing a second order granting preliminary relief does not persuade otherwise. (Doc. 223 at 13 (citing 18 U.S.C. § 3626(a)(2) ("The PLRA expressly permits a court, '[i]n any civil action with respect to prison conditions,' to 'enter *a* temporary restraining order or *an* order for preliminary injunctive relief.'")) (emphasis added)).

Finally, Defendants contend that Plaintiffs seek agency-wide policy changes in contradiction to the PLRA. (Doc. 223 at 2). However, as the Court has made clear, the relief granted in this Ruling and Order applies *only* to the Farm Line at LSP.

The Court will proceed to the merits.

### C. The Court will Grant Plaintiffs' Request for Temporary Restraining Order and Require Defendants to Issue a Heat Alert When the Heat Index Meets or Exceeds 88 Degrees Fahrenheit and Monitor the Heat Index Every 30 Minutes on the Farm Line at LSP.

For the reasons below, the Court finds that Plaintiffs have shown a substantial likelihood of success on the merits of their Eighth Amendment claims regarding the Heat Alert threshold and heat index monitoring. Dr. Vassallo credibly testified that incarcerated persons working on the Farm Line at LSP are at substantial risk of

18

App.18

serious harm due to their prolonged exposure to heat indices above 88 degrees Fahrenheit, but under Defendants' new policies, Defendants do not currently issue a Heat Alert until the heat index meets or surpasses 91 degrees Fahrenheit. (Doc. 201-3 at ¶ 4). Dr. Vassallo also credibly testified that monitoring the heat index only every two hours may not adequately protect the health of all workers on the Farm Line, particularly those who are heat sensitive. (*Id.* at ¶ 8).

The Court finds that Defendants have likely been deliberately indifferent to those risks by *raising* the Heat Alert threshold without sufficient thermoregulatory basis *after* the Court ordered Defendants to make changes on the Farm Line to protect human health and safety. Defendants' sole expert witness at the hearing admitted that no court has ever qualified him as an expert in thermoregulation, and this Court did not qualify him as an expert in thermoregulation, either. (Doc. 239 at 53:19–22; 62:24–63:1). Similarly, Defendants are aware that "significant" increases in heat index (up to 14 degrees Fahrenheit) can and do occur within a two-hour period near the Farm Line at LSP, yet have refused to revise their policies or practices to acknowledge this reality. (Doc. 201-6 at 150:7–12; Doc. 201-9).

The Court also finds that Plaintiffs have shown an immediate risk of irreparable injury because the current conditions on the Farm Line at LSP "create a substantial risk of injury or death." Finally, the Court finds that the balance of interests favors the issuance of a TRO.

Accordingly, the Court will grant Plaintiffs' request for a TRO and require Defendants to issue a Heat Alert on the Farm Line at LSP when the heat index meets

19

or exceeds 88 degrees Fahrenheit. The Court will further require Defendants to monitor the heat index every 30 minutes on the Farm Line at LSP.

### i. Plaintiffs Have Shown a Substantial Likelihood of Success on the Merits.

To show a substantial likelihood of prevailing on the merits of their Eighth Amendment claims, Plaintiffs must first show that conditions on the Farm Line render incarcerated persons at substantial risk of suffering serious harm. Plaintiffs must then show that Defendants have likely been deliberately indifferent to such risks. For the following reasons, the Court finds that both elements have been satisfied, and that Plaintiffs have demonstrated a substantial likelihood of prevailing on the merits of their claims.

A substantial risk of harm may be found when prison conditions are such that they deprive an inmate of "the minimal civilized measure of life's necessities." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)). Subjecting incarcerated persons to high heat conditions without adequate mitigatory procedures satisfies the substantial risk of serious injury or death element of an Eighth Amendment claim. *Hinojosa v. Livingston*, 807 F.3d 657, 670 (5th Cir. 2015) ("[I]nmates have a right, under the Eighth Amendment, not to be subjected to extreme temperatures without adequate remedial measures").

Addressing the danger of excessive heat in prisons, the U.S. District Court for the Western District of Texas recently emphasized:

> This case concerns the plainly unconstitutional treatment of some of the most vulnerable, marginalized members of our society. The Court finds

20

App.20

that Plaintiffs have met their burden of establishing a likelihood of success on the merits that [defendant] Collier is violating the Eighth Amendment's prohibition against cruel and unusual punishment. ***The Court is of the view that excessive heat is likely serving as a form of unconstitutional punishment.***

*Bernhardt Tiede, II v. Collier*, No. 1:23-CV-01004-RP, Doc. 202, p. 90 (W.D. Tex. Mar. 29, 2025) (emphasis added). This may be the case here.

### a. The Experts.

Here, Plaintiffs' expert Dr. Susi Vassallo, a licensed physician and expert in thermoregulation, credibly testified that incarcerated persons working on the Farm Line at LSP are at substantial risk of serious harm due to their prolonged exposure to heat indices above 88 degrees Fahrenheit.[7] (Doc. 201-3 at ¶ 4). Dr. Vassallo further opined that all people, including young people and those with no known medical problems, are at risk for heat-related disorders during persistent exposure to a heat index above 88 degrees Fahrenheit. (*Id.* at ¶ 14). Dr. Vassallo pointed to the following graph to demonstrate the sharp increase in mortality when the apparent temperature (also known as the heat index) reaches 86 degrees Fahrenheit:

---

[7] Thermoregulation refers to the "process by which the human body maintains its temperature within a safe physiological range." (Doc. 37-3 at p. 7).

21



(*Id.* at ¶ 15). According to Dr. Vassalo, outdoor workers have died of heat stroke when the day's maximum heat index was only 86 degrees Fahrenheit, and the Occupational Safety and Health Administration ("OSHA") has found that less severe heat-related illnesses can happen at even lower heat index values. (*Id.* at ¶ 16).

When asked which populations were at risk of dehydration if the temperature exceeds 88 degrees Fahrenheit, Dr. Vassalo testified that the literature indicates that "anybody who is in that temperature" can become dehydrated. (Doc. 245 at 113:14–19). Dr. Vassalo testified regarding the following table, which shows that heat-related emergency room visits, hospitalizations, and deaths often occur at the 88 degree Fahrenheit heat index threshold:

22



**Figure 5.** The modeled relationship between the relative risk of heat-related mortality (top panels), heat-related hospitalization (middle panels), and heat-related emergency department visits (lower panels), and three same-day heat index metrics (HI$_{max}$, HI$_{mean}$, HI$_{min}$), as in Figure 1. MRT is the temperature at which the fewest events were observed. Note that the vertical axis scale varies between panels.

(Doc. 245 at 60:20–61:14; Pl. Ex. 41 at 5).

Dr. Vassallo also opined that monitoring the heat index only every two hours may not adequately protect the health of all workers on the Farm Line, particularly those who are heat sensitive. (Doc. 201-3 at ¶ 8). The National Weather Service ("NWS") data excerpts in the record show sharp increases in heat index readings over a 2-hour period. (Doc. 201-9). For example, on August 6, 2024, the heat index at the

23

New Roads False River Regional Airport (where the parties currently monitor the heat index) increased from 88 to 102 degrees Fahrenheit between 7:55 A.M. and 9:55 A.M. (*Id.* at 2; 11–12). The uncontroverted evidence shows that Defendants are aware of the significant increases in heat indices over two hours near the Farm Line at LSP. Dr. Randy Lavespere, DOC's Chief Medical Officer who testified on behalf of DOC as its Federal Rule of Civil Procedure 30(b)(6) witness, stated that he agreed that the August 6, 2024 heat index increase was a "significant swing." (Doc. 201-6 at 150:7–12).

Further bolstering the Court's finding that Dr. Vassallo is a credible expert in the field of thermoregulation, the Fifth Circuit and other district courts, including this Court, have repeatedly found Dr. Vassallo credible. In *Yates v. Collier*, 868 F.3d 354, 363–64 (5th Cir. 2017), the Fifth Circuit emphasized:

> Dr. Vassallo is a licensed physician and a recognized expert in the field of thermoregulation and hyperthermia, with over twenty-five years treating heat stroke and heat-related disorders. Dr. Vassallo has previously served as an expert witness in lawsuits challenging prison conditions, and ***this court has (at least) twice upheld district court findings that relied heavily on Dr. Vassallo's testimony***. *See Ball*, 792 F.3d at 593–94; *Gates*, 376 F.3d at 339–40.

*Yates*, 868 F.3d at 363–64 (emphasis added).

In *Lewis v. Cain*, this Court emphasized: "First, this Court has already found Dr. Vassallo's opinion ***highly credible*** in the liability portion of this case. Second, the Fifth Circuit and a number of courts within the Fifth Circuit have accepted Dr. Vassallo's expertise in medical care in prison systems." *Lewis v. Cain*, 701 F. Supp. 3d 361, 402 (M.D. La. 2023), *appeal dismissed sub nom. Parker v.*

24

*Hooper*, 128 F.4th 691 (5th Cir. 2025) (emphasis added) (citing *Yates v. Collier*, 868 F.3d 354, 363–64 (5th Cir. 2017); *Ball v. LeBlanc*, 792 F.3d 584, 593–94 (5th Cir. 2015); *Gates v. Cook*, 376 F.3d 323, 339–40 (5th Cir. 2004*); Cole v. Collier*, 2017 WL 3049540, *9 (S.D. Tex. 2017); *Cole v. Livingston*, 2016 WL 3258345, *3 (S.D. Tex. 2016); *McCollum v. Livingston*, 2017 WL 608665, *22 (S.D. Tex. 2017)).

In *Bernhardt Tiede, II v. Collier*, the U.S. District Court for the Western District of Texas relied on Dr. Vassallo's testimony when evaluating vulnerability to heat, finding Dr. Vassallo's testimony to be based on "credible, published medical studies." *Bernhardt Tiede, II v. Collier*, No. 1:23-CV-01004-RP, Doc. 202, p. 11 (W.D. Tex. Mar. 29, 2025)

In *Cole v. Collier*, the U.S. District Court for the Southern District of Texas found Dr. Vassallo's testimony credible, emphasizing that "Dr. Vassallo's expert report and testimony regarding the effects of heat on the human body were extremely thorough, and that she has extensive knowledge on this subject." *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *14 n. 16 (S.D. Tex. July 19, 2017). This Court agrees and finds Dr. Vassallo's testimony credible, thorough, and supported by scientific literature.

Contrarily, Defense expert Dr. Carl Keldie was wholly uncredible. No court has ever qualified Dr. Keldie as an expert on the topics of heat-related medical care and disorders or thermoregulation. (Doc. 239 at 49:15–18). Dr. Keldie has no current Board certifications. (*Id.* at 50:8–11). Dr. Keldie has not published any articles, books, chapters, or scientific studies on any topic. (*Id.* at 50:12–14). Dr. Keldie has not

participated in peer review of any scientific articles, nor does he know what a peer reviewed file is. (*Id.* at 50:15–17; 80:23–81:9). The last time Dr. Keldie treated patients in an emergency room setting was 25 years ago. (*Id.* at 50:18–20).

Dr. Keldie believes that LSP "is more like a community than a prison." (*Id.* at 96:22–24). Dr. Keldie formed his opinion that there have been no heat-related deaths on the Farm Line at LSP on the sole basis that someone at LSP told him so. (*Id.* at 119:4–9). Dr. Keldie does not know whether there have been any heat injuries among incarcerated people at LSP over the last decade. (*Id.* at 83:10–16). Dr. Keldie opined that classic or non-exertional heatstroke affects people who cannot remove themselves from a hot environment or who have limited access to hydration or cooling modalities, but in his opinion, those conditions are not experienced at LSP. (*Id.* at 80:12–19).

Dr. Keldie recommended that DOC raise the Heat Alert threshold from a heat index of 88 to 95 degrees Fahrenheit. (*Id.* at 76:24–77:3). After additional discussions, Defendants raised the Heat Alert threshold three degrees instead of seven—from 88 to 91 degrees Fahrenheit. (*Id.* at 76:24–77:3). In Dr. Keldie's opinion, it would be "very reasonable and extremely safe" to set a heat alert threshold to a heat index of 95 degrees Fahrenheit. (*Id.* at 91:1–4). Dr. Keldie believes that a heat index of 103 degrees Fahrenheit is a "moderate level" of heat. (*Id.* at 91:5–7).

Dr. Vassallo emphasized that DOC's decision to raise the Heat Alert threshold to a heat index of 91 degrees Fahrenheit is unsupported by the scientific literature. (Doc. 201-3 at ¶ 14; Doc. 245 at 59:6–19). She opined that the sources cited by the

26

DOC in HCP8 either do not support Dr. Keldie's conclusions or outright contradict them. (Doc. 201-3 at ¶ 13). This was borne out on cross-examination.

Although Defendants argued that Dr. Keldie's opinion was supported by OSHA, his opinion was belied by an OSHA article cited *in his own report*. The OSHA guidance indicated: "Physical labor increases the heat experienced by workers. Sports physiologists recognize that heat-related illness may occur, surprisingly, at low to moderate temperatures, including below 65 [degrees] Fahrenheit when workload is very heavy[.]" (Pl. Ex. 5 at 3). OSHA warns that "[o]utdoor workers have died of heat stroke when the day's maximum Heat Index was only 86 [degrees] Fahrenheit." (*Id.* at 6). Additionally, "less severe heat-related illnesses can happen at even lower Heat Index values." (*Id.* at 6).

> OSHA guidance further emphasizes:
>
> Most heat-related illnesses affect workers who do strenuous physical activity. When workers engage in intense work, their bodies create heat. This "metabolic" heat combines with environmental heat (from temperature, sunlight, humidity, etc.) so workers' core temperature can rise to dangerous levels.
>
> To prevent a hazardous combination of environmental and metabolic heat, **employers should be aware of workers' activity level.** Workload can be classified as light, moderate, heavy, or very heavy.

(*Id.* at 6). OSHA lists "[p]icking fruits or vegetables," "[r]aking," "[u]sing hand tools," and "[c]ontinuous normal walking" as examples of moderate workload activities that could trigger heat-related illnesses. (*Id.* at 8).

Although Dr. Keldie testified that he relied on a U.S. Army chart when recommending a threshold for heat precautions, a review of that chart shows that a

27

App.27

wet globe temperature of 90 degrees Fahrenheit or greater is categorized as the highest heat category—level 5, a black category. (Doc. 239 at 94:23–95:2). Dr. Keldie admitted that the U.S. Army chart does not refer to "heat index" at all, and that the chart does not consider environmental conditions or the weather in its definition of "easy work." (Doc. 239 at 94:3–20; 95:16–19).

44. USARIEM. Department of the Army and Air Force. Heat stress control and heat casualty management. TB MED 507/AFPAM 2003; 66:48. http://www.usariem.army.mil/pages/download/tbmed507.pdf (Accessed on December 20, 2011).

Most Current Update April 12, 2022

**Table 3–2. Fluid replacement and work-rest guidelines for training in warm and hot environments[1]**

| Heat Category | WBGT Index (°F) | Easy Work (250 W) | | Moderate Work (425 W) | | Heavy Work (600 W) | | Very Heavy Work (800 W) | |
|---|---|---|---|---|---|---|---|---|---|
| | | Work-Rest | Water Intake (qt/hr) | Work-Rest | Water Intake (qt/hr) | Work-Rest | Water Intake (qt/hr) | Work-Rest | Water Intake (qt/hr) |
| 1 (white) | 78-81.9 | NL | ½ | NL | ¾ | 40/20 | ¾ | 20/40 | 1 |
| 2 (green) | 82-84.9 | NL | ½ | NL | ¾ | 30/30 | 1 | 15/45 | 1 |
| 3 (yellow) | 85-87.9 | NL | ¾ | NL | ¾ | 30/30 | 1 | 10/50 | 1 |
| 4 (red) | 88-89.9 | NL | ¾ | 50/10 | ¾ | 20/40 | 1 | 10/50 | 1 |
| 5 (black) | > 90 | NL | 1 | 20/40 | 1 | 15/45 | 1 | 10/50 | 1 |

| Easy Work | Moderate Work | Heavy Work | Very Heavy Work |
|---|---|---|---|
| • Weapon maintenance<br>• Marksmanship training<br>• Drill and ceremony | • Patrolling with 30-pound load<br>• Low and high crawl<br>• Dig defensive position | • Patrolling with 45-pound load<br>• Four-person litter carry (180 pounds)<br>• Jogging 4 mph | • Two-person litter carry (150 pounds)<br>• Move under direct fire<br>• Obstacle course |

Legend:
NL = no limit to work per hour (up to 4 continuous hours).
Notes:
1. Applies for average-sized and heat-acclimatized Service member wearing the Operational Camouflage Patten (OCP) uniform.
2. The work-rest times and fluid replacement volumes will sustain performance and hydration for at least 4 hours of work in the specified heat category.
3. Fluid needs can vary based on individual differences (± ¼ qt/hr) and exposure to full sun or full shade (± ¼ qt/hr).
4. Rest means minimal physical activity (sitting or standing) accomplished in shade if possible.
5. CAUTION: Hourly fluid intake should not exceed 1½ qt.
6. CAUTION: Daily fluid intake should not exceed 12 qt.
7. If wearing heavy protective clothing (CBRN, JSLIST), add 10 ºF to WBGT index for easy work and 20 ºF to WBGT index for moderate and heavy work.

(Pl. Ex. 51).

28

DOC's Chief Medical Officer Dr. Lavespere testified on DOC's behalf regarding the guidance DOC relied on when increasing the Heat Alert threshold from 88 to 91 degrees Fahrenheit. (Doc. 245 at 209:3–7). The only guidance Dr. Lavespere could point to that DOC relied on when increasing the Heat Alert threshold was a single chart from the NWS:



Figure 1. Heat index chart.

In order to determine the heat index using the chart above, you need to know the air temperature and the relative humidity. For example, if the air temperature is 100°F and the relative humidity is 55%, the heat index will be 124°F. When the relative humidity is low, the apparent temperature can actually be lower than the air temperature. For example, if the air temperature is 100°F and the relative humidity is 15%, the heat index is 96°F (use this calculator). In the Panhandles, we commonly see hot temperatures during the summer, but the low relative humidity values make it somewhat unusual to see dangerous heat index values (i.e. 103°F or greater). A full heat index chart for a larger range of temperatures and relative humidity values can be found at this link.

It surprises many people to learn that the heat index values in the chart above are for shady locations. If you are exposed to direct sunlight, the heat index value can be increased by up to 15°F. As shown in the table below, heat indices meeting or exceeding 103°F can lead to dangerous heat disorders with prolonged exposure and/or physical activity in the heat.

(Pl. Ex. 6; Doc. 245 at 209:3–7). But Dr. Lavespere agreed that this chart is for "shady locations" only. (Doc. 245 at 203:14–25). According to the NWS, if a person is exposed

29

to direct sunlight, the heat index can be increased by up to 15 degrees Fahrenheit. (*Id.*; Pl. Ex. 6).

Dr. Lavespere agreed that the NWS chart indicates that "extreme caution" should be undertaken at 90 degrees Fahrenheit *in the shade*. (Doc. 204:24–205:4). And although Dr. Lavespere testified that incarcerated persons are working under direct sunlight on the Farm Line at LSP "at times," he explained that the only instance in which incarcerated persons working on the Farm Line would *not* be working in direct sunlight is when there are clouds in the sky. (Doc. 245 at 205:5–17 (The Court: "At what times would a field of vegetables not to be exposed to [. . .] direct sunlight?" Dr. Lavespere: "There are often clouds at Angola all the time."). Photographs of the Farm Line confirm that incarcerated persons working on the Farm Line are working in an open field:



(Pl. Ex. 35).

The Court credits Dr. Vassallo's opinion and discredits Dr. Keldie's opinion.

### b. Other Courts Have Also Accepted a Heat Index of 88 Degrees.

In finding that Dr. Vassallo has credibly testified that all incarcerated persons working on the Farm Line are at an increased risk of physical harm at a heat index of 88 degrees Fahrenheit such that a Heat Alert should be issued at that temperature, the Court emphasizes that at least two other courts within the Fifth Circuit have reached the same conclusion.

In *Cole v. Collier*, the Southern District of Texas emphasized: "***Dr. Vassallo credibly testified that***, based on her several decades of clinical experience and a thorough review of the existing literature, ***temperatures above a heat index of 88 degrees significantly increase the risk of heat-related illness.***" *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *18 (S.D. Tex. July 19, 2017) (emphasis added). The court further emphasized that it had "no basis upon which to question Dr. Vassallo's choice of 88 degrees as a threshold above which the risk of heat-related illness increases," and found that "this choice is sound." *Id.*

In *Bernhardt Tiede, II v. Collier*, the Western District of Texas similarly emphasized: "***Dr. Vassallo credibly testified that a heat index of 88 [degrees] or higher poses a substantial risk of adverse health outcomes in all inmates—***

31

even those who are young and healthy."[8] *Bernhardt Tiede, II v. Collier*, No. 1:23-CV-01004-RP, Doc. 202, p. 13 (W.D. Tex. Mar. 29, 2025) (emphasis added).

Plaintiffs have shown that conditions on the Farm Line at LSP render incarcerated persons at substantial risk of suffering serious harm.

### c.  Deliberate Indifference.

Plaintiffs must additionally show that Defendants acted with deliberate indifference to the substantial risk of serious harm addressed above. "Deliberate indifference is defined as a failure to act where prison officials have knowledge of a substantial risk of serious harm to inmate health or safety." *Cole*, 2017 WL 3049540, at *40 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). It is an "extremely high" standard to meet. *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Ball*, 792 F.3d at 594. On this point, "a prison official's knowledge of a substantial risk of harm may be inferred if the risk was obvious." *Cole*, 2017 WL 3049540, at *40 (citing *Farmer*, 511 U.S. at 829). Despite this high standard, Plaintiffs have provided sufficient

---

[8] The Court recognizes that *Cole* and *Bernhardt Tiede* involved heat indoors, while the Farm Line at LSP is outdoors. According to Dr. Vassallo, however, outdoor workers have died of heat stroke when the day's maximum heat index was only 86 degrees Fahrenheit, and OSHA has found that less severe heat-related illnesses can happen at even lower heat index values. (Doc. 201-3 at ¶ 16). Dr. Vassallo also opined that the potentially deadly health consequences of DOC's decision to raise the heat alert threshold are compounded by other limitations of DOC's heat related policies and practices. (*Id.* at ¶ 17).

32

evidence for the Court to determine that they are likewise substantially likely to prevail on this element of their Eighth Amendment claims.

Courts have found that "deliberate indifference may [] be 'demonstrated straightforwardly, through direct evidence that an administrator was aware of serious systemic deficiencies and failed to correct them.'" *Cain*, 2023 WL 7299130, at *48 (quoting *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1129 (M.D. Ala. 2016)); *see also Cole*, 2017 WL 3049540, at *40 (finding that defendants knew that a risk of serious harm existed after nearly two dozen men died of heat-related illnesses, and when inmates and correctional officers regularly experienced heat-related illnesses). Here, Defendants chose to increase the Heat Alert threshold from 88 to 91 degrees Fahrenheit *after* the Court ordered Defendants to improve conditions on the Farm Line to preserve human health and safety. (*See* Doc. 70). Indeed, the Court's July 2 Order made clear the risks present when the heat index exceeds 88 degrees Fahrenheit:

> Dr. Vassallo reports that "[h]eat-related disorders occur when the body's temperature control system is overloaded, and the body is unable to adequately dissipate heat." ([Doc. 37-3] at p. 10). Further, the "***risk for heat stroke and heat-related disorders increases sharply when the heat index exceeds 88 degrees Fahrenheit.***" *(Id.).* Some heat-related disorders include "heat syncope (fainting), heat cramps, heat exhaustion, and heat stroke." *(Id.).* Heat exhaustion and heat stroke can manifest in similar ways, including through light-headedness, thirst, nausea, weakness, fainting, irregular heartbeat, and abdominal cramps, because heat exhaustion can precede heat stroke. (*Id.* at p. 11). Heat strokes can occur rapidly and without warning. *(Id.* at p. 12). In fact, two-thirds of victims "experience symptoms for less than one day before being hospitalized or being found dead." (*Id.*). Victims may also be physically or mentally incapable of calling for

33

help, as heat stroke can lead to feelings of confusion and alter the afflicted's mental status. (*Id.*). Heat stroke "carries a significant risk of death and permanent disability." (*Id.* at p. 13). Dr. Vassallo points out that "[s]tudies have shown heat stroke mortality rates ranging from 30-80%. Survivors of heat stroke may have significant heat-related morbidity, such as permanent inability to walk and talk." (*Id.*). Further, "[p]ermanent neurological damage occurs in up to 17% of survivors." (*Id.*).

Dr. Vassallo opines that ***"[a]ll people, including healthy people with no known medical problems, are at risk for heat related disorders during persistent exposure to a heat index above 88 degrees Fahrenheit.***" (*Id.* at pp. 19-20). "In addition to causing dehydration and heat stroke, extreme heat can 'affect otherwise healthy people's kidneys, liver, heart, brain, and lungs, which may cause renal failure, heat attack, and stroke." (*Id.* at p. 21 []). Further, "deaths due to heat alone, due to cardiovascular disease alone, and due to heat and cardiovascular disease combined, increase with the number of cumulative days of heat exposure." (*Id.* at p. 27). In other words, the risk of death from both heat-related diseases and facially unrelated diseases increases with the temperature.

(Doc. 70 at 40–42 (emphasis added)). Defendants simply ignored these compelling medical findings. Moreover, the fact is that DOC is well aware of the significant temperature swings that may occur within a two-hour period near LSP. (Doc. 201-6 at 150:7–12). Thus, in this case, deliberate indifference is demonstrated straightforwardly.

### d. Conclusion.

Plaintiffs have shown that incarcerated persons working on the Farm Line at LSP are at substantial risk of suffering serious harm under Defendants' current heat index monitoring and Heat Alert practices. The Heat Alert threshold is medically significant because many protections—including bringing heat sensitive persons indoors, providing water and ice, and giving work breaks at specified intervals—are

mandatory only once a heat alert is called. (Doc. 201-3 at ¶ 9). And for a Heat Alert to be accurately called, more contemporaneous data collected in more frequent intervals is necessary.

As it stands, incarcerated persons working on the Farm Line at LSP will not receive medically significant protections until a Heat Alert is called at a heat index of 91 degrees Fahrenheit, sometime within a 2-hour window of when the heat index actually reached 91 degrees Fahrenheit. Defendants' current policies and practices place incarcerated persons at LSP at substantial risk of suffering serious harm.

Plaintiffs have also shown that Defendants have likely been deliberately indifferent to such risks, increasing the Heat Alert threshold from 88 to 91 degrees Fahrenheit after the Court placed Defendants on notice that they must improve conditions on the Farm Line at LSP to preserve human health and safety, and failing to modify their policies despite their full knowledge that the temperature in Louisiana can sharply increase in a two-hour period. (*See* Doc. 70).

### ii. Plaintiffs Have Shown Immediate Risk of Irreparable Injury.

Based on the foregoing, the Court concludes that, at this stage, Plaintiffs have shown that conditions on the Farm Line "create a substantial risk of injury or death." *Cole*, 2017 WL 3049540, at *43. Irreparable harm is generally "one for which there is no adequate remedy at law." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (quoting *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 251 (5th Cir. 2023) (internal quotations omitted)). There is no adequate

remedy at law for non-economic injuries like death or serious physical injury, and so Plaintiffs have satisfied this element. *See, e.g., Vazquez Barrera v. Wolf*, 455 F. Supp. 3d 330, 340 (S.D. Tex. 2020) (finding that allegations that plaintiffs "face[d] a heightened risk of dying or suffering from serious illness" constituted "imminent and irreparable" harm); *East v. Blue Cross & Blue Shield of La.*, No. 3:14-CV-00115-BAJ, 2014 WL 8332136, at *2 (M.D. La. Feb. 24, 2014).

Additionally, and alternatively, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting 11A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE, § 2948.1 (3d ed. 1998)). Plaintiffs have shown that they are likely being denied their Eighth Amendment rights. Accordingly, Plaintiffs have shown an immediate risk of irreparable injury.

### iii. Balance of Interests.

In determining whether to grant injunctive relief, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987). In other words, Plaintiffs must establish "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted." *See Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). Plaintiffs must also establish "that the grant of an injunction will not disserve the

36

public interest." *Id.* However, "[t]hese factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plainly, "the public interest supports the protection of Eighth Amendment rights." *Marlowe v. LeBlanc*, 2020 WL 1983915, at *2 (M.D. La. Apr. 27, 2020); *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 fn. 9 (5th Cir. 2014). As noted, it is likely that Plaintiffs will succeed on their Eighth Amendment claims, and so the public interest favors an injunction.

The potential harms suffered by Plaintiffs far exceeds any harm suffered by Defendants by the issuance of injunctive relief, as the potential harms alleged by Plaintiffs are serious and potentially life-threatening. *See Collier*, 2017 WL 3049540, at *43 ("[I]f the Court were to fail to order remedies in this lawsuit, Plaintiffs' safety would be severely undermined, leading to a substantial risk of irreparable injury"); *Harding v. Edwards*, 487 F. Supp. 3d 498, 527 (M.D. La. 2020) (Dick, C.J.) ("Even though Plaintiffs' serious illness or death is not an *inevitable* result . . . the increased risk of such is still more detrimental than the abstract injury the state would suffer"). On the other hand, Defendants suggest that they will suffer harm because this TRO will prevent them from creating and enforcing their own policies. Human health and safety is the most imperative interest. Accordingly, the balance of interests favors the issuance of injunctive relief.

### iv. Bond Requirements

Courts may waive the bond requirement provided in Federal Rule of Civil Procedure 65(c) when appropriate. *City of Atlanta v. Metro. Atlanta Rapid*

37

*Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981); *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978); *Cole*, 2017 WL 3049540, at *44. The Court will do so here, and no bond shall be imposed. The majority of Plaintiffs are incarcerated persons with limited resources, and "[p]laintiffs have brought this suit to enforce constitutional rights," a factor which weighs in favor of waiving the bond requirement. *See Cole*, 2017 WL 3049540, at *44 (citing *City of Atlanta*, 636 F.2d at 1094).

### V. CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiffs' **Application For A Second Temporary Restraining Order (Doc. 201)** is **GRANTED.** Plaintiffs' request for a preliminary injunction will be addressed separately.

**IT IS FURTHER ORDERED** that Defendants shall issue a "Heat Alert" on the Farm Line at LSP whenever the heat index meets or exceeds 88 degrees Fahrenheit.

**IT IS FURTHER ORDERED** that Defendants shall monitor the heat index on the Farm Line at LSP every 30 minutes.

Baton Rouge, Louisiana, this 23rd day of May, 2025

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**